KIEVE LAW OFFICES
  Loren Kieve (Bar No. 56280)
  lk@kievelaw.com
5A Funston Avenue
The Presidio of San Francisco
San Francisco, California  94129-1110
Telephone:     (415) 364-0060
Facsimile:      (435) 304-0060
lk@kievelaw.com

SHAPIRO SHER GUINOT & SANDLER
  Paul Mark Sandler (Pro Hac Vice pending)
  pms@shapirosher.com
  Eric R. Harlan (Pro Hac Vice pending)
  erh@shapirosher.com
36 South Charles Street
Charles Center South, Suite 2000
Baltimore, Maryland  21201
Telephone:     (410) 385-0202
Facsimile:      (410) 539-7611

Counsel for Plaintiff Gulf Coast Medical Group, LLC, dba SkinMedix

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| GULF COAST MEDICAL GROUP, LLC, dba SkinMedix<br>8805 Tamiami Trail North # 252<br>Naples, Florida 34108<br>,<br><br>             Plaintiff,<br><br>       vs.<br><br>NETSUITE, INC.<br>2955 Campus Drive, Suite 100<br>San Mateo, California 94403,<br><br>             Defendant. | Civil Action No.<br><br>COMPLAINT<br><br>(FRAUDULENT MISPRESENTATION, NEGLIGENT MISREPRESENTATION, RESTITUTION, VIOLATION OF BUS. & PROF. CODE § 17200, BREACH OF CONTRACT AND TREBLE DAMAGES UNDER PENAL CODE § 496)<br><br>DEMAND FOR JURY TRIAL |

*Parties*

1.   Plaintiff Gulf Coast Medical Group, LLC, dba SkinMedix ("SkinMedix") is a Florida limited liability company with its principal place of business in Naples, Florida.

Complaint                                                               1

2. Defendant NetSuite, Inc. ("NetSuite") is a Delaware corporation with its principal place of business in San Mateo, California. NetSuite regularly conducts business in Florida, throughout the United States and worldwide.

## Jurisdiction

3. This court has jurisdiction under 28 U.S.C. § 1332(a)(1) because the action is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

## Intradistrict Assignment

4. Venue is proper in this court and division under 28 U.S.C. § 1391(a) and Civil Local Rule 3-2.

## Facts

5. SkinMedix operates SkinMedix.com, an internet-based "e-commerce" retailer of anti-aging skin care and related products. SkinMedix sells these products domestically and internationally.

6. NetSuite is a provider of software solutions and applications for internet-based "e-commerce" businesses that holds itself out as a leading provider of on-demand, integrated business management software for growing and medium-sized businesses. NetSuite represents that it enables companies like SkinMedix to manage all key business operations in a single hosted system, including customer relationship management ("CRM"), order fulfillment, inventory, accounting and finance, e-commerce, and web site management.

7. In September 2012, having outgrown its current web-host/shopping cart platform, SkinMedix began a search to locate an enterprise level CRM software application that could more efficiently manage both its "back office" functions (e.g., accounting, inventory, etc.) and its sales functions. SkinMedix also required an e-commerce solution that could grow with it as it expanded the number of products it sold and the number of markets it served.

8. At the time, SkinMedix was utilizing an "off the shelf" e-commerce software platform from Bigcommerce that was barely adequate to handle its annual sales volume and then-current

inventory of 3,000 products. SkinMedix required a platform that could scale with its anticipated growth to an inventory of 20,000 products – a nearly seven-fold increase.

9. At the same time SkinMedix was seeking to upgrade its e-business platform, NetSuite was aggressively targeting medium-sized businesses such as SkinMedix for its enterprise software solutions.

10. NetSuite represented in its marketing materials that NetSuite's service was sophisticated enough to grow or "scale" with companies as they grew, and that it was able to deliver "sub-second page rendering" whereas "the industry standard is page loads in less than two seconds."

11. After researching several providers in the marketplace, and after reviewing and relying on NetSuite's marketing materials and the representations asserted in them, SkinMedix's President, Aaron Kozol, contacted NetSuite to learn more about the solutions it offered, and to determine if and how NetSuite could help SkinMedix grow and succeed.

12. Throughout January 2013 and into February 2013, Mr. Kozol communicated extensively with NetSuite's Sales Account Executive, Donald Bizzaro, about SkinMedix's requirements for a business software solution, and SkinMedix's particular needs.

13. Because of the high cost of NetSuite's software solutions, Mr. Kozol specifically inquired about whether NetSuite could deliver a business solution that met all of SkinMedix's needs. If NetSuite could not provide the specific services SkinMedix needed to run and grow its business, there was no need for SkinMedix to utilize NetSuite, and to incur the high cost of implementing its services.

14. Mr. Bizzaro expressly represented to Mr. Kozol and SkinMedix that NetSuite would be able to meet all of SkinMedix's needs that Mr. Kozol described to Mr. Bizarro and NetSuite.

15. Mr. Bizzaro is an aggressive salesperson who describes himself as a "product evangelist."

16. On information and belief, Mr. Bizarro would, and did, receive commissions or other compensation for his sales of NetSuite's services to SkinMedix.

17. Mr. Bizarro did not tell Mr. Kozal that he, Mr. Bizarro, had only just begun – in December 2012 – working and selling for NetSuite.

18. In his overly zealous efforts to induce SkinMedix to purchase services from NetSuite, Mr. Bizarro made numerous false representations of fact, as described more fully below.

19. In his communications with Mr. Bizzaro, Mr. Kozol described the requirements that SkinMedix needed in any software solution that it would purchase from NetSuite.

20. Specifically, Mr. Kozol advised Mr. Bizzaro that SkinMedix's then-current webstore suffered from slow and inconsistent page load times.

21. Mr. Kozol stressed that SkinMedix required a solution for its customer-facing website that delivered ultra-high speed page loading and image rendering. Without this functionality, Mr. Kozol stated, potential customers faced with slow page loading while browsing SkinMedix's products would not remain on the site, and would look to another retailer.

22. In setting out SkinMedix's requirement of high-speed page loading, Mr. Kozol told Mr. Bizzaro about a 2007 study by Amazon that showed there was a 1% decrease in sales for every 100 microsecond increase in page loading time. Mr. Bizzaro stated to Mr. Kozol that he was aware of the 2007 Amazon study, and that he understood the importance and critical nature of high speed page loading for an internet-based business.

23. Mr. Bizzaro told Mr. Kozol that he understood SkinMedix's requirements, and agreed that it is impossible for an online retailer with a slow website to attract and retain customers. Mr. Bizzaro represented to Mr. Kozol and SkinMedix that NetSuite was not only capable of providing "sub-second" page rendering, but also that its Project Team could and would provide that level of functionality for SkinMedix.

24. In particular, Mr. Bizzaro represented that NetSuite had the capability to, and would, design and host a SkinMedix website where, when a user navigated from page to page, each page would load and appear in less than a second.

25. Because SkinMedix sells its products around the world, Mr. Kozol also stressed that a critical requirement was that a NetSuite solution had to provide automatic currency conversion for its web customers, so that, when a customer outside of the United States browsed the SkinMedix

Complaint    4    Civil Action No.

website and viewed a product, the price of that product had to be converted to, and displayed in, (a) the global customer's native currency and (b) the correct price based on the appropriate current US dollar-native currency exchange rate.

26. Mr. Bizzaro represented that NetSuite's solutions were capable of achieving this functionality, and because of this capability, NetSuite had the ability to, and would, provide currency conversion in any solution it designed for SkinMedix.

27. Mr. Kozol also emphasized to Mr. Bizzaro that SkinMedix's customers were loyal to certain SkinMedix product brands, so that it was essential that any website created by NetSuite for SkinMedix feature "brand-prominent" navigation.

28. Specifically, Mr. Kozol told Mr. Bizzaro that SkinMedix required a website where a customer could easily and quickly navigate among all the products of a particular brand and that, when a customer used this "shop-by-brand" function, the resulting product pages and images needed to load in the same high speed fashion described above.

29. Mr. Bizzaro stated that he understood Mr. Kozol's and SkinMedix's requirements for brand-prominent navigation.

30. Mr. Bizarro represented to Mr. Kozol and SkinMedix that NetSuite had the capability to design and operate a shop-by-brand navigation function that would have "sub-second" page loading and image rendering, and that any website NetSuite designed and operated for SkinMedix would have that critical functionality.

31. Mr. Kozol also informed Mr. Bizzaro that SkinMedix was expanding its business to grow its inventory from 3,000 to 20,000 products, and that SkinMedix therefore required that any e-commerce software solution it purchased be scalable with SkinMedix's growth. As Mr. Kozol explained to Mr. Bizarro, as SkinMedix increased the inventory that would be displayed and accessible on its customer website, and as SkinMedix's sales (and web traffic) grew, its software solution had to continue delivering high speed page loading and functional currency conversion to support its expanded business.

32. Mr. Bizzaro responded and represented that NetSuite's solutions, with NetSuite's sophisticated servers and infrastructure could and would scale with SkinMedix as it grew, and

were capable of continuously providing the critical functionality (high speed page loading and currency conversion) that SkinMedix required as SkinMedix increased its inventory and sales.

33.   Automatic recurring billing and autoship ("ARB") is an internet function where a customer can agree to have a seller automatically (a) send the customer a desired product on a recurring basis and (b) bill and charge the customer for the sale, eliminating the need for the customer to manually order the product each time the customer wants to purchase it.

34.   ARB is a key component in internet sales for companies like SkinMedix.

35.   In their discussions, Mr. Kozol emphasized to Mr. Bizzaro that ARB was an essential requirement for SkinMedix's ongoing and future sales growth.  Mr. Kozol told Mr. Bizzaro that Bigcommerce (SkinMedix's current provider) did not offer ARB on its platform, and SkinMedix absolutely had to have ARB as part of any service that NetSuite provided.

36.   Mr. Bizzaro stated that he understood Mr. Kozol's and SkinMedix's requirements for ARB, and represented to Mr. Kozol and SkinMedix that NetSuite not only had ARB capability, but that NetSuite would include ARB in any service and website design that NetSuite provided for SkinMedix.

37.   In their discussions, Mr. Bizzaro expressly represented that, using NetSuite's ARB capablity, SkinMedix would realize a 30% growth in sales in its first year implementing NetSuite's service.

38.    Mr. Kozol told Mr. Bizzaro that SkinMedix, like many retailers, experienced its highest traffic and sales volume during the holiday season beginning in December and lasting through January, so that any NetSuite software solution for SkinMedix had to be fully implemented and "go live" by no later than August 2013, so that SkinMedix would have sufficient time to test the platform and work out any bugs or issues so that SkinMedix's internet website was fully functional and could meet SkinMedix's needs before the 2013-2014 holiday season.

39.   In response, Mr. Bizzaro represented to Mr. Kozol and SkinMedix that NetSuite's team would be led by an experienced project manager and could and would design and implement a complete solution for SkinMedix – with a customer facing website and full back-office functionality – that would be ready for testing by August 2013.

40. Mr. Bizzaro told Mr. Kozol that it would be "pushing it" for NetSuite to have the promised SkinMedix solution (with back-office and a customer facing website) functional and ready for testing by July 2013, but NetSuite would certainly have the solution ready by August 2013.

41. At all relevant times, Mr. Bizzaro was acting as an agent, representative and employee of NetSuite.

42. In reliance on Mr. Bizzaro's specific representations – including NetSuite's ability to provide SkinMedix with (a) high speed page loading; (b) currency conversion; (c) brand-prominent, "shop by brand" navigation; (d); scalability; (e) automatic recurring billing ("ARB") functionality resulting in a 30% growth in sales; and (f) implementation and testing by August of 2013, described above – SkinMedix was induced to and did enter into an agreement with NetSuite in February 2013 to purchase its software solutions and service.

43. SkinMedix agreed to purchase a three-year license for NetSuite's "back-office" software solution, and agreed to pay NetSuite to design and build SkinMedix's customer facing website.

44. Immediately before executing the contract with NetSuite, Mr. Kozol contacted Mr. Bizzaro to express his concern that there did not appear to be any reference to the ARB functionality in NetSuite's proposed contract documents.

45. In response Mr. Bizzaro assured Mr. Kozol and SkinMedix that ARB functionality was included in the contract documents because it was "never out of scope" for SkinMedix, was "fully developed in NetSuite, " "was a given and considered included" in the contract, and "is and will be a seamless component of your NetSuite experience."

46. On or about February 27, 2013, in reliance on the express promises and representations described above, SkinMedix entered into a contract with NetSuite.

47. In entering into the contract with NetSuite, Mr. Kozol and SkinMedix relied on Mr. Bizzaro's express representations about the existence of the ARB functionality in the contract.

48. Pursuant to the contract, SkinMedix paid NetSuite and affiliated partners approximately $250,000.00 between March and July 2013 for the services described above.

49. Not long after SkinMedix contracted with NetSuite to provide it with its e-commerce software services platform, a NetSuite marketing representative contacted Mr. Kozol to interview him about his experience with NetSuite.

50. Although the NetSuite solution had yet to be implemented for SkinMedix at the time of the interview, Mr. Kozol expressed his enthusiasm about the NetSuite capabilities that Mr. Bizzaro had represented to Mr. Kozol and to SkinMedix and how "nothing had given [SkinMedix] all the answers to run the business from top to bottom until NetSuite,"

51. After entering into its contract with NetSuite, it became apparent that NetSuite was incapable of delivering and providing the services that Mr. Bizzaro represented that NetSuite was able to provide to SkinMedix.

52. The website NetSuite designed for Skin Medix was not capable of delivering sub-second page loading times.

53. Testing by SkinMedix has demonstrated paged loading times of greater than four seconds domestically and seven seconds internationally.

54. Despite repeated complaints from SkinMedix, the website NetSuite designed for it has never achieved sub-second page loading and has never achieved the industry standard of "less than 2 seconds."

55. NetSuite was incapable of designing and implementing a functioning currency converter.

56. The website NetSuite designed informs SkinMedix's global customers in a page footer that a product price is shown in the consumer's native currency, and that the customer will be charged in U.S. dollar equivalents.

57. The website also provides a drop-down menu for a customer to choose the currency in which product prices are displayed.

58. In actuality, the website displays product prices in U.S. dollars only, regardless of which currency a customer selects and regardless of what the page footer states.

59. This presents a tremendous potential liability for SkinMedix, as its website, as developed by NetSuite, effectively misrepresents product prices to global customers.

Complaint                                                    8                                    Civil Action No.

60. Contrary to Mr. Bizzaro's representations, NetSuite did not have the capability of providing high-speed brand-prominent "shop by brand" navigation.

61. When a customer chooses to shop for products by brand, the product pages and images fail to load at sub-second speeds, and in many instances require up to seven seconds to load.

62. This is because any time a customer selects "shop by brand," NetSuite's design architecture causes a search of SkinMedix's entire inventory of products, and then sorts the entire inventory for the selected brand before populating a results page.

63. NetSuite therefore did not have the efficient, high-speed page loading brand-prominent navigation feature Mr. Bizzaro represented it had, so that hat feature was not in the website NetSuite designed for SkinMedix.

64. NetSuite's website coding and architecture searches every item in SkinMedix's inventory before arriving at a landing page.

65. This makes it incapable of scaling with SkinMedix's anticipated growth.

66. NetSuite and its Project Team do not have the capability of providing sub-second page loading times for SkinMedix's current inventory of 3,000 products.

67. Adding additional inventory and products correspondingly increases page load times.

68. The NetSuite design therefore is incapable of maintaining sub-second page loading in the face of SkinMedix's anticipated 20,000 item product inventory.

69. NetSuite therefore does not and did not have the capability of designing a customer facing website for SkinMedix that could scale with its growth, as Mr. Bizzaro represented.

70. The website NetSuite designed for SkinMedix and the services that NetSuite provided to SkinMedix did not include an automatic recurring billing ("ARB") function.

71. NetSuite failed to design and implement the promised SkinMedix customer facing website by August 2013.

72. NetSuite's design team, including its project manager, was incapable of designing and implementing the solution SkinMedix required by August 2013.

1    73.  Mr. Bizzaro and NetSuite (a) knew that the representations he and NetSuite made to
2 Mr. Kozol and SkinMedix described above were false, (b) made those misrepresentations without
3 knowledge of or regard for whether they were true or false, and (c) should have known that his
4 representations were false.

5    74.  Mr. Bizzaro made those representations with the intent that Mr. Kozol and SkinMedix
6 would rely on them so that SkinMedix would purchase NetSuite's services.

7    75.  As a result of Mr. Bizzaro's representations, and in reasonable reliance on them,
8 SkinMedix (a) was induced to enter into a contract with NetSuite and (b) has paid over a quarter of
9 a million dollars to NetSuite and its affiliates in exchange for a service that is useless to
10 SkinMedix.

11    76.  The customer facing website that NetSuite designed for SkinMedix performs (a)
12 worse than the Bigcommerce-based website SkinMedix sought to replace; (b) was never used by
13 SkinMedix; and (c) is manifestly unuseable for the reasons described herein.

14    77.  SkinMedix cannot use the website NetSuite created because of the unacceptably slow
15 page rendering (which would drive customers away); its inability to provide correct currency
16 conversions (which would potentially give rise to misrepresentation claims when global customers
17 order an item at a price they thought was in their native currency, but are then charged a different
18 amount); its inability to provide brand-prominent navigation; its inability to scale with
19 SkinMedix's anticipated growth; and its lack of an ARB function.

20    78.  Because of the numerous failures described herein, the website NetSuite designed for
21 SkinMedix never went "live."  That is, the website was never publicly available for use by
22 potential SkinMedix customers.

23    79.  SkinMedix's anticipated growth is being hampered by NetSuite's website's failings.

24    80.  Mr. Kozol and SkinMedix have notified NetSuite and its design engineers and project
25 managers of NetSuite's numerous failures described above.

26    81.   NetSuite has failed, refused, or been unable to correct the failures.

27    82.  NetSuite has failed to provide SkinMedix with a website and services that contain the
28 required functionality that Mr. Kozol and SkinMedix told Mr. Bizzaro SkinMedix had to have,

1  and that Mr. Bizzaro represented that NetSuite had the capability of delivering and would deliver
2  to SkinMedix.

3  83. It has been more than a year since SkinMedix paid NetSuite to build its customer
4  facing website and paid for the use its "back office" administrative solutions.

5  84. During this time, NetSuite has proved itself incapable of constructing a website that
6  contained the specific functions that Mr. Bizzaro represented that NetSuite had the ability to
7  design and implement, thus frustrating SkinMedix's entire purpose for engaging NetSuite's
8  services as opposed to those of other providers.

9  85. SkinMedix has paid NetSuite a year's worth of licensing fees for a "back-office"
10 solution that has been unnecessary and gone unused because NetSuite's customer facing website
11 cannot, for the reasons stated above, be deployed to generate the sales that would be administered
12 through the "back office" solution.

13 86. At the time when Mr. Kozol was in the futile process of identifying NetSuite's
14 failures and requesting that these failures be corrected, NetSuite published a "Customer Spotlight"
15 article on its official NetSuite blog featuring SkinMedix.

16 87. The article purported to state how SkinMedix had found success by using NetSuite to
17 support all of its business processes.

18 88. The article stated that NetSuite supported "SkinMedix's growing international
19 business and transactions in multiple currencies, including those of Hong Kong, Japan, Australia,
20 New Zealand, the U.K., Sweden, Canada, as well as the Euro."

21 89. In fact, as described above, the website NetSuite designed for SkinMedix did not
22 support SkinMedix's international business because it did not contain a functional currency
23 converter.

24 90. NetSuite's blog article also represented that SkinMedix now had a recurring orders
25 capability with NetSuite. As stated above, the ARB capability has never been functional and was
26 never provided by NetSuite.

27 91. NetSuite's blog article also represented that "the new SkinMedix website automates
28 display of out-of-stock notifications."

1   92. As described below, that feature, despite being provided for by NetSuite in its
2   contract, never functioned.
3   93. NetSuite's blog also contains a screen shot of what purports to be the customer-facing
4   website that NetSuite designed for SkinMedix, which bears the caption "The SkinMedix site
5   powered by NetSuite SuiteCommerce."
6   94. In actuality, the screen-shot depicts the existing Bigcommerce website that
7   SkinMedix sought to replace, but has been unable to replace because of the multiple
8   misrepresentations and failings of NetSuite described above.
9   95. On January 10, 2014, SkinMedix, through counsel, provided written notice to
10  NetSuite's general counsel of the issues and problems with NetSuite's service, and requested that
11  SkinMedix and NetSuite confer in an effort to resolve the matter.
12  96. Through counsel, NetSuite referred SkinMedix to a NetSuite Practice Director who
13  purportedly would assist SkinMedix with resolving the service failures as described above.
14  97. NetSuite's Practice Director initially failed to respond to correspondence from Mr.
15  Kozol and SkinMedix, and later referred Mr. Kozol and SkinMedix to the same NetSuite project
16  managers who had previously failed to grasp and resolve the problems Mr. Kozol and SkinMedix
17  indentified in 2013.
18  98. NetSuite has failed to address and correct the issues identified by Mr. Kozol and
19  SkinMedix.

### Count I

### *Fraudulent Misrepresentation*

22  99. SkinMedix incorporates the allegations in the preceding paragraphs as if fully set
23  forth herein.
24  100. NetSuite through its authorized agent Mr. Bizzaro represented to Mr. Kozol of
25  SkinMedix that NetSuite had capability to design, implement and deliver an e-commerce software
26  solution with the specific capability and functionality described above and to do so by August of
27  2013.
28  101. At the time Mr. Bizzaro made these representations, he knew they were false.

1       102. Mr. Bizzaro made these representations with the specific intent that Mr. Kozol and SkinMedix would rely on them to cause and induce SkinMedix to purchase services from NetSuite.

4       103. Mr. Kozol and SkinMedix relied on Mr. Bizzaro's representations

5       104. Their reliance was reasonable in light of Mr. Bizzaro's professed knowledge of NetSuite's capabilities.

7       105. As a result of Mr. Bizzaro's and NetSuite's false representations, and Mr. Kozol's and SkinMedix's reliance on them, SkinMedix entered into a contract with NetSuite where SkinMedix purchased a three year license for certain software solutions and paid for certain website design and support services from NetSuite.

11       106. Because Mr. Bizzaro's representations were false, the services that SkinMedix purchased from NetSuite were and are neither functional nor useable by SkinMedix.

13       107. SkinMedix paid NetSuite and its partners in excess of $250,000.00.

14       108. SkinMedix did not receive any value or benefit for those payments.

15       109. As a further result of Mr. Bizzaro's and NetSuite's misrepresentations, SkinMedix has sustained a loss of profits and loss of business growth from December 1, 2013 to the present and continuing.

18       110. SkinMedix was forced to divert hundreds of hours of employee time, and additional expenses, in a futile attempt to cause NetSuite to deliver a website that NetSuite was not capable of producing.

### *Count II*

### *Negligent Misrepresentation*

23       111. SkinMedix incorporates the allegations in the preceding paragraphs as if fully set forth herein.

25       112. NetSuite, through its authorized agent Mr. Bizzaro, represented to Mr. Kozol of SkinMedix, that NetSuite possessed the capability to design, implement and deliver an e-commerce software solution with the specific capability and functionality described above and to do so by August of 2013.

113. At the time Mr. Bizzaro made the representations to Mr. Kozol and SkinMedix, Mr. Bizzaro knew, or in the exercise of reasonable care, should have known, that NetSuite did not possess those capabilities, making Mr. Bizzaro's representations false.

114. Mr. Bizarro intended that Mr. Kozol and SkinMedix would rely on those representations and induced them to rely on them.

115. Mr. Kozol and SkinMedix relied on Mr. Bizzaro's representations.

116. Their reliance was reasonable in light of Mr. Bizzaro's professed knowledge of NetSuite's capabilities.

117. As a result of Mr. Bizzaro's and NetSuite's false representations, and Mr. Kozol's and SkinMedix's reasonable reliance on them, SkinMedix entered into a contract with NetSuite where SkinMedix purchased a three year license for certain software solutions and paid for certain website design and support services from NetSuite.

118. Because Mr. Bizzaro's representations were false, the services that SkinMedix purchased from NetSuite were and are neither functional nor useable by SkinMedix.

119. SkinMedix paid NetSuite and its affiliates in excess of $250,000.00 and did not receive any value or benefit for those payments.

120. As a further result of Mr. Bizzaro's negligent misrepresentations, SkinMedix has sustained a loss of profits and loss of business growth from December 1, 2013 to the present and continuing.

121. SkinMedix was forced to divert hundreds of hours of employee time, and additional expenses, in a futile attempt to cause NetSuite to deliver a website that NetSuite was not capable of producing.

122. These damages did not result in any way from any negligence on the part of SkinMedix.

### Count III

### *Restitution*

123. SkinMedix incorporates the allegations in the preceding paragraphs as if fully set forth herein.

124. As a result of the fraudulent or negligent representations described above, SkinMedix entered into a contract with NetSuite where SkinMedix paid NetSuite and affiliates in excess of $250,000.00.

125. Had NetSuite not made the statements described above, but instead disclosed NetSuite's actual capabilities or the lack of those capabilities, SkinMedix would not have entered into its agreement with NetSuite or paid NetSuite the sums described.

126. Independent of any misrepresentations, SkinMedix has paid substantial sums to NetSuite and has in turn received a purported e-commerce solution that is not capable of being used by SkinMedix, and which, if deployed by SkinMedix, would cause SkinMedix to lose business and would expose it to potential liability that includes, but is not limited to, liability for price misrepresentation to its global customers.

127. NetSuite has been unjustly enriched, and it would be inequitable for NetSuite to retain any of the monies that SkinMedix has paid to it.

### Count IV

### Violation of Business and Professions Code § 17200 et seq.

128. SkinMedix incorporates the allegations in the preceding paragraphs as if fully set forth herein.

129. NetSuite's conduct constitutes unfair or fraudulent business acts or practices within the meaning of Business and Professions Code § 17200.

130. SkinMedix is entitled to "such order[] or judgment[] ... as may be necessary to prevent the use or employment by [NetSuite of those] practice[s] which constitute[] unfair competition" and "as may be necessary to restore to [SkinMedix] its "money or property" that NetSuite "acquired by means of such unfair competition." Business and Professions Code § 17203.

### Count V

### Breach of Contract

131. SkinMedix incorporates the allegations in the preceding paragraphs as if fully set forth herein.

1      132. SkinMedix entered into a contract with NetSuite in which SkinMedix agreed to pay
2 NetSuite certain sums in consideration for NetSuite to provide and implement an e-commerce
3 solution for SkinMedix's business.

4      133. In consideration for the sums paid and to be paid by SkinMedix, NetSuite agreed to
5 provide a solution that possessed the capabilities described above.

6      134. NetSuite failed to provide these capabilities, which constitutes a material breach of its
7 contract with SkinMedix.

8      135. In addition to the currency conversion functionality, high speed page loading
9 capability, and website scalability previously described, NetSuite agreed to provide other
10 functions that are critical to a viable e-commerce business.

11      136. Specifically, NetSuite agreed to provide website navigational functions that included,
12 but are not limited to: (a) "previous and next"; (b) "shop by brand"; (c) "shop by category"; and
13 (d) "breadcrumbs."

14      137. None of these promised functions has worked properly in the website NetSuite
15 designed.

16      138. Without an easily and properly navigable website with these features, customers will
17 neither remain browsing SkinMedix's website to purchase its products nor return to it.

18      139. These failings each constitute a material breach of SkinMedix's contract with
19 NetSuite.

20      140. NetSuite agreed to equip the SkinMedix website with a "back in stock notification"
21 function and a product review function.

22      141. The former allows a customer to request e-mail notification when a desired, but out-
23 of-stock product is available for purchase, thus increasing SkinMedix's sales; the latter permits
24 customers to review products, which SkinMedix could then moderate and choose which reviews
25 to publish on its website.

26      142. Neither of these functions operates properly.

27      143. Customers do not receive notification of the availability of desired items – which will
28 result in a sales decline – and SkinMedix is not able to publish favorable customer reviews.  These

breaches are material because they amount to noticeable deficiencies in a customer's web browsing experience, which will drive web traffic away from SkinMedix and to a competitor.

144. NetSuite agreed to provide SkinMedix with an ARB function as described above.

145. NetSuite has failed and refused to provide this functionality.

146. This failure constitutes a material breach of NetSuite's contract with SkinMedix.

147. As a direct and proximate result of NetSuite's breaches of contract, as described above, SkinMedix has paid in excess of $250,000.00 for a purported e-commerce solution that is not capable of being used by SkinMedix, and which, if deployed by SkinMedix, would cause SkinMedix to lose business and expose it to potential liability that includes, but is not limited to, liability for price misrepresentation to its global customers.

148. SkinMedix was forced to divert hundreds of hours of employee time, and additional expenses, in a futile attempt to cause NetSuite to deliver a website that NetSuite was not capable of producing.

## Count VI

### Violation of Penal Code § 496

149. SkinMedix incorporates the allegations in the preceding paragraphs as if fully set forth herein.

150. Penal Code § 496(a) makes receiving or buying property "that has been obtained in any manner constituting theft" a criminal offense punishable by imprisonment. Penal Code § 496(c) provides that any person "who has been injured by a violation of [§ 496(a)] ... may bring an action for three times the amount of actual damages, if any, sustained by the plaintiff, costs of suit, and reasonable attorney's fees."

151. Section 496(a) extends to property "that has been obtained in any manner constituting theft."

152. Penal Code § 484 describes acts constituting theft. The first sentence of § 484(a) states in relevant part: "Every person . . . who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, . . . and thereby fraudulently gets or obtains possession of money, . . . is guilty of theft."

Complaint                                      17                              Civil Action No.

153. Section 484 thus defines theft to include theft by false pretense. Penal Code § 532 also defines criminal fraud in terms nearly identical to § 484(a) and provides that these acts are punishable "'in the same manner and to the same extent' as larceny."

154. As a result of the false and fraudulent representations by Mr. Bizarro and NetSuite set out above, NetSuite knowingly and designedly, by false or fraudulent representation or pretense, defrauded SkinMedix of the money and funds it paid to NetSuite and thereby fraudulently got or obtained possession of money from SkinMedix.

155. SkinMedix has been injured by a violation of Penal Code § 496(a) and is therefore entitled pursuant to Penal Code § 496(c) to three times the amount of its actual damages, together with its costs of suit and reasonable attorney's fees.

### *Prayer for Relief*

Wherefore, plaintiff Gulf Coast Medical Group, LLC, d/b/a SkinMedix, prays that this Court:

A. Rescind the contract between it and NetSuite;

B. Require NetSuite to restore to SkinMedix as restitution the sums it has paid to NetSuite;

C. Award SkinMedix compensatory damages in excess of $75,000.00;

D. Award SkinMedix damages for its lost profits;

E. Award SkinMedix punitive damages;

F. Award SkinMedix three times its actual damages;

G. Award SkinMedix its costs and attorney's fees; and

H. Grant SkinMedix such other relief as may be just and proper.

Dated: May 13, 2014                KIEVE LAW OFFICES

By /s/ Loren Kieve
Loren Kieve (Bar No. 56280)

SHAPIRO SHER GUINOT & SANDLER

Complaint                          18                       Civil Action No.

By /s/ *Paul Mark Sandler*

Paul Mark Sandler *(Pro Hac Vice pending)*
Eric R. Harlan, Esquire *(Pro Hac Vice pending)*

Counsel for plaintiff Gulf Coast Medical Group, LLC, d/b/a SkinMedix

### Jury Demand

Plaintiff demands a jury trial as to all issues triable to a jury.

Loren Kieve
Counsel for plaintiff Gulf Coast Medical Group, LLC, d/b/a SkinMedix